UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF ALABAMA

In re                                                Case No. 04-80098-DHW
                                                     Chapter 11
3-D CASH & CARRY, INC.,

        Debtor.
_____

SOUTHTRUST BANK,

        Plaintiff,
v.                                                   Adv. Proc. No. 04-8005-DHW

3-D CASH & CARRY, INC. and
LAMAR DAVIS, INC.,

        Defendants.

BANK OF WEDOWEE,

        Intervenor.


MEMORANDUM OF DECISION

SouthTrust Bank filed this adversary proceeding to obtain a declaration that the bank's mortgages on two parcels of real property secure all of the debts of 3-D Cash & Carry, Inc. to SouthTrust Bank. The complaint is predicated on dragnet clauses contained in the two mortgages.[1]

---

[1] The bank also requests a determination that the proceeds from the two parcels may be applied at the bank's discretion. This opinion does not address that portion of the complaint, and that issue is reserved for later ruling.

After entry of partial summary judgment in the bank's favor, a trial on the complaint was held November 16, 2004. The defendants orally moved to reconsider the grant of partial summary judgment.

The defendants challenge the dragnet clauses on two bases: (1) the clauses are ambiguous and do not clearly reveal the intent of the parties; (2) the mortgages containing the clauses were procured by fraud. Under the latter scenario, the mortgages are voidable.

For the following reasons, the court concludes that the dragnet clauses are valid and enforceable.

Findings of Fact

Lamar Davis solely owned and operated 3-D Cash & Carry, Inc., a hardware business, from 1987 until 1998. At that time he transferred the business to his son, Jeff Davis. However, Lamar Davis remained as vice-president for a couple of years.

After transferring the hardware business to his son, Lamar Davis decided to acquire 55 acres of land near Roanoke, Alabama to develop into a residential subdivision. He spoke with SouthTrust's Roanoke President Ronnie Whaley about a loan for the purpose of acquiring and developing the land. Lamar Davis had done business with SouthTrust through 3-D Cash & Carry, Inc. since the mid nineties.

Lamar Davis advised Ronnie Whaley of his intent to form a new corporation through which to purchase and develop the land. However, Lamar Davis individually had not done business with the bank and had no established line of credit. Ronnie Whaley suggested that the loan be made and the property purchased through 3-D Cash & Carry because 3-D Cash & Carry had an established line of credit and a good payment record. He also suggested a one-year note.

Both Jeff Davis and Lamar Davis testified that Ronnie Whaley

2

represented that the property, the note and the mortgage could be transferred to the new corporation after it was formed. Jeff Davis agreed to run the transactions through 3-D Cash & Carry.

3-D Cash & Carry borrowed approximately $40,000 from SouthTrust Bank to purchase the property and an additional amount for development. 3-D Cash & Carry executed a mortgage on the subdivision property dated November 1, 2000.[2] The mortgage contains the following dragnet clause:

> [I]n consideration of the indebtedness described above and other valuable consideration to [the Debtor], the receipt and sufficiency of which are hereby acknowledged, and in order to secure the payment and performance of the indebtedness described above, any extensions, renewals, modifications, and increases thereof and substitutions therefor and all interest thereon, all sums advanced by [SouthTrust] pursuant to the terms of this mortgage, *and all other indebtedness (including future loans and advances) now or hereafter owed to [SouthTrust] by [the Debtor]*, whether such indebtedness is primary or secondary, direct or indirect, contingent or absolute, matured or unmatured, joint or several, and otherwise secured or not . . ., the undersigned Three-D Cash & Carry, Inc. . . . [does] hereby grant, bargain, sell, convey, assign, grant a security interest in, transfer and warrant unto [SouthTrust] . . . [the Subdivision] (emphasis added).

Lamar Davis proceeded developing the property into a subdivision which included the construction of streets and a 7-acre lake and the installation of utilities. Jeff Davis, through one of his companies other than the debtor, built some of the houses in the subdivision. In addition, Lamar Davis formed a new corporation, Lamar Davis, Inc.

---

[2] Jeff Davis signed the note and mortgage as president of 3-D Cash & Carry. Lamar Davis did not sign either the note or the mortgage.

Both Lamar Davis and Jeff Davis testified that they asked Ronnie Whaley on numerous occasions to transfer the property and the loan documents out of 3-D Cash & Carry, Inc. into Lamar Davis, Inc. Whaley responded with excuses and oral promises to draft the instruments.

In March 2001, at Whaley's request, attorney John Tinney prepared a deed transferring the subdivision property from 3-D Cash & Carry to Lamar Davis, Inc.[3] Lamar Davis signed the deed on March 8, 2001 as President of 3-D Cash & Carry.[4] Lamar Davis, Inc. paid no money to 3-D Cash & Carry in exchange for the deed.

Both Jeff and Lamar Davis testified that Ronnie Whaley continued to represent that a new note and mortgage would be prepared in the name of Lamar Davis, Inc. However, Whaley never prepared the documents.

Lamar Davis, Inc. sold 5 or 6 lots in the subdivision. Pursuant to an oral agreement with the bank, each time a lot was sold, Lamar Davis, Inc. remitted $20,000 to the bank from the sale proceeds. The bank then released its mortgage on the sold lot. Lamar Davis made no principal payments on the subdivision note other than from the sale proceeds of individual lots.

A few months after 3-D Cash & Carry deeded the subdivision to Lamar Davis, Inc., the subdivision note came up for renewal. Jeff Davis

---

[3] John Tinney regularly rendered legal services both for SouthTrust Bank and other clients including Lamar Davis.

[4] Lamar Davis was not president of 3-D Cash & Carry at the time he signed the deed. Lamar testified that he had authority from 3-D Cash & Carry to sign the deed. Jeff Davis was out of town at the time.

The deed does not reference the existing mortgage of SouthTrust Bank. In fact, the deed represents that 3-D owns the property free from all encumbrances. However, the defendants do not dispute that the property secures the subdivision note.

4

signed the renewal note as president of 3-D Cash & Carry. The renewal is dated October 31, 2001, one year after the date of the mortgage.

After 3-D Cash & Carry began having financial problems, Jeff Davis again suggested to SouthTrust that the subdivision note be transferred to Lamar Davis to reduce the indebtedness owed by the debtor. This suggestion was made as late as August 2003.

On November 18, 2003, Lamar Davis offered to pay the balance due on the subdivision note, approximately $135,000, if SouthTrust would release the mortgage on the subdivision property. SouthTrust refused.

SouthTrust contends that the dragnet clause contained in the subdivision mortgage renders the subdivision security for all of the debts of 3-D Cash & Carry. The subdivision has equity above the indebtedness which could reduce the debts of 3-D Cash & Carry.

3-D Cash & Carry filed a petition under chapter 11 on January 28, 2004. SouthTrust filed a proof of claim in the case for the approximate amount of $415,000. The claim is based on two mortgages and the following promissory notes:

> (1) December 26, 2000 note in the amount of $81,427.95. The loan was made to enable 3-D Cash & Carry to purchase 3 acres of land to build a lumberyard;
>
> (2) September 13, 2001 note in the amount of $86,127.48. The loan consolidated several equipment notes.
>
> (3) September 14, 2001 note in the amount of $190,100. The loan was made to enable 3-D Cash & Carry to build the lumberyard.
>
> (4) October 31, 2001 note in the amount of $174,597.77. This loan renewed the initial subdivision loan.

5

SouthTrust holds a mortgage on the lumberyard property as well as the subdivision property. SouthTrust contends that, because of the dragnet clauses in the mortgages, the lumberyard property and the subdivision property secure all of the debts owed by 3-D Cash & Carry.

The dragnet clause is boilerplate language in the bank's commercial mortgages. The bank includes the dragnet clause in every commercial mortgage because it obviates the necessity to execute a new mortgage for each outstanding and future note.

The dragnet clause was particularly important on the subdivision loan because of the projected value of the subdivision. An appraisal dated September 6, 2000 projected that the completed subdivision would have a value of $375,000.

Ronnie Whaley no longer works for SouthTrust Bank and did not testify at the trial. Two of the members of the lending committee that approved the loan testified at the trial. Whaley did not mention the proposed transfer of the loan at the committee meetings. Neither was it referenced in the "Credit Offering Report" which the committee reviewed in conjunction with the loan application. Whaley prepared the Credit Offering Report.

## Contentions of the Parties

SouthTrust Bank contends that the dragnet clauses are valid and enforceable and render the two parcels security for all of the debts of 3-D Cash & Carry.

The defendants contend that the dragnet clause in the subdivision mortgage is ambiguous and further that the subdivision mortgage was procured by fraud.[5] Though it is not clear, it appears that the defendants

---

[5] Although Lamar Davis, Inc. was not a signatory to the note and mortgage, as a third-party beneficiary, Lamar Davis, Inc. stands in the shoes of the debtor

6

do not contest the validity of the dragnet clause in the lumberyard mortgage.

SouthTrust denies the representations alleged to have been made by Ronnie Whaley. Because Ronnie Whaley did not testify at the trial, the bank offered circumstantial evidence to rebut the representations.

However, whether Ronnie Whaley actually made the representations is not critical to this proceeding because even if the representations were made, the defendants cannot prevail for the following reasons.

Parole Evidence Rule

SouthTrust Bank asserts that the dragnet clauses are unambiguous and therefore the parole evidence rule prevents the defendants from introducing extrinsic evidence to vary or contradict the dragnet clauses.

The parol evidence rule is a substantive rule of contract law and not a rule of evidence. *Ungerleider v. Gordon*, 214 F.3d 1279 (11th Cir. 2000). The purpose of the rule is to preserve the sanctity of a written contract by excluding extrinsic evidence of prior or contemporaneous agreements when the parties intend the writing to express their complete agreement. *See First Commercial Bank v. Spivey*, 694 So. 2d 1316, 1326-27 (Ala. 1997). Prior or contemporaneous agreements are deemed to have merged with the written instrument. *Id*.

The defendants contend that the dragnet clause in the subdivision mortgage does not fall within the ambit of the parol evidence rule because it is ambiguous. The defendants cite to the following authority:

> Whether other debts between the same parties are secured under a "dragnet clause" depends upon the intention of the parties, <u>Malkove v. First Nat'l Bank, 295 Ala. 191, 195, 326</u>

---

and may assert defenses which the debtor could assert.

So.2d 108, 111 (1976), at the time of the execution of the mortgage. *See First Nat'l Bank v. Cotton, 231 Ala. 288, 164 So. 371 (1936)*. The "dragnet clause" must evidence a clear and explicit intent for the real estate to secure future advances. *In re Bonner, 43 B.R. 261, 262 (Bktcy.N.D.Ala.1984); Underwood v. Jarvis, 358 So.2d 731, 735 (Ala.1978)*. This is especially true when a debtor owes several notes and gives a mortgage expressly securing one; any intention to cover other existing notes should be quite clear and explicit to say the least.

The defendants contend that the dragnet clause does not clearly and explicitly reveal an intent to secure the existing debts of 3-D Cash & Carry because those debts are not specifically itemized in the dragnet clause.[6]

> However, existing indebtedness need not be itemized:
>
> It is the law in Alabama, however, that a dragnet clause which, although not itemizing the existing indebtedness, does, by clear and unequivocal terms, reference and include a specific and identifiable antecedent debt, extends the coverage of the security agreement to that antecedent debt. The dragnet clause, therefore, may be given the full effect of its terms. *See Underwood v. Jarvis, 358 So.2d 731 (Ala.1978); City National Bank of Dothan v. First National Bank of Dothan, 285 Ala. 340, 232 So.2d 342 (1970); First National Bank of Guntersville v. Bain, 237 Ala. 580, 188 So. 64 (1939)*.

*Dixie Ag Supply, Inc. v. Nelson*, 500 So. 2d 1036, 1040 (Ala. 1986).

The defendants further offer the *Jarvis* case to support their argument that the dragnet clause is ambiguous. *See Underwood v. Jarvis*, 358 So.2d

---

[6] Though it is not clear from evidence, the lumberyard debt was apparently already in existence at the time the subdivision mortgage was executed. If so, the lumberyard note referenced *supra* must be a renewal of the original note.

8

731 (Ala.1978). However, the *Jarvis* mortgage was held to be ambiguous because the dragnet clause was in conflict with the defeasance clause. Those clauses in the instant mortgage are not in conflict and do not create an ambiguity.

The court concludes that the instant dragnet clause is not ambiguous and clearly and explicitly embraces existing, antecedent debts as well as future advances made by SouthTrust to 3-D Cash & Carry.[7]

Fraud

The defendants alternatively contend that the subdivision mortgage was procured by fraud. The parol evidence rule does not prevent evidence of fraud:

> The parol evidence rule rendering parol or extrinsic evidence inadmissible to contradict or vary the terms of a written contract, valid on its face, is inapplicable where the issue is whether the contract was procured by fraud because the parol evidence rule can not be used as a shield to prevent the proof of fraud.

37 Am. Jur. 2d *Parol or Extrinsic Evidence* § 480 (2001); *Cf. Dixon v. SouthTrust Bank*, 574 So.2d 706 (Ala. 1990); *Environmental Systems, Inc. v. Rexham Corp.*, 624 So. 2d 1379 (Ala. 1993). "Fraud which may be proved by parol or extrinsic evidence may consist of fraud either in the execution or in the inducement of a contract."[8] 37 Am. Jur. 2d at § 480.

---

[7] The defendants do not argue that the dragnet clause does not embrace future advances made to 3-D Cash & Carry. However, it is interesting to note that all of the notes in question in this proceeding postdate the subdivision mortgage. This may be due to the fact that some or all of the notes are renewals of previous notes.

[8] "The distinction between 'fraud in the inducement' and 'fraud in the execution' is that the former induces a party to assent to something he otherwise

9

The defendants contend that SouthTrust Bank fraudulently induced Jeff Davis to sign the loan documents by misrepresenting that the loan documents would be transferred to Lamar Davis, Inc. once the new corporation was formed.

To prevail on a fraud claim under Alabama law, the defendants must prove by substantial evidence that the bank made a material misrepresentation on which the defendants reasonably relied to their detriment. *See Foremost Ins. Co. v. Parham*, 693 So. 2d 409, 421 (Ala. 1997); *Allstate Ins. Co. v. Eskridge*, 823 So. 2d 1254, 1264 (Ala. 2001).

Under Alabama law, the reliance on the representation must be reasonable. *Foremost*, 693 So. 2d at 421. Alabama abandoned the "justifiable reliance" standard because it "eliminated the general duty on the part of a person to read the documents received in connection with a particular transaction." *Id.* Therefore, parties cannot succeed in a fraud claim where they "were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms." *Id.* Cf. *Alfa Mutual Ins. Co. v. Northington*, 561 So. 2d 1041 (Ala. 1990).[9]

The defendants did not prove by substantial evidence that they were not capable of reading and understanding the documents. Therefore, to the

---

would not have while the latter induces a party to believe the nature of his act is something entirely different than it actually is." 17A Am. Jur. 2d *Contracts* § 214 (2004).

[9] "'[A] fraudulent inducement case is not made out simply by alleging that a statement or agreement made prior to the contract is different from that which now appears in the written contract. Quite to the contrary, attempts to prove such contradictory asserts [are] exactly what the Parol Evidence Rule was designed to prohibit.'" *Id.* at 1048 (quoting Morris G. Shanker, *Judicial Misuses of the Word Fraud to Defeat the Parol Evidence Rule and the Statute of Frauds (With Some Cheers and Jeers for the Ohio Supreme Court)*, 23 Akron L. Rev. 1 (1989)).

10

extent that the dragnet clause in the subdivision mortgage is inconsistent with Ronnie Whaley's representation, the defendants could not reasonably rely on that representation.

## Statute of Frauds

However, even if the defendants reasonably relied on the representation, their fraud claim fails for another reason. The representation constitutes an agreement to release the subdivision property from securing other debts of 3-D Cash & Carry. An agreement to release real property from the effect of a mortgage falls with the statute of frauds. *Ala. Code* § 8-9-2(5) (1975); *Casey v. Travelers Ins. Co.,* 585 So. 2d 1361, 1363 (Ala. 1991). The statute of frauds is usually asserted in defense to a contract action on the oral agreement. However, the statute of frauds also bars tort claims predicated on the existence of an oral agreement unenforceable under the statute of frauds. *Holman v. Childersburg Bancorporation, Inc.*, 852 So. 2d 691 (Ala. 2002); *Bruce v. Cole*, 854 So. 2d 47 (Ala. 2003) (promissory fraud is not an exception to the statute of frauds). Therefore, the defendants cannot prevail on their claim that the bank fraudulently induced the defendants to sign the subdivision mortgage.

## Conclusion

The court concludes that the dragnet clauses are not ambiguous and clearly embrace both existing and future debts of 3-D Cash & Carry, Inc. The court further concludes that the defendants have not proved that the subdivision mortgage was procured by fraud. Therefore, the dragnet clauses are valid and enforceable.

The result reached is consistent with the equities of this case as well. In essence, the defendants are asking the court to honor the distinction between the two corporate entities. Yet the defendants did not honor that distinction. The defendants agreed to run the transactions through 3-D Cash & Carry. This apparently benefitted Lamar Davis by resulting in a more expeditious loan. After that, Lamar Davis signed the deed to Lamar

11

Davis, Inc. as president of 3-D Cash & Carry at a time when he was no longer president. Further, Lamar Davis, Inc. paid no money to 3-D in exchange for the subdivision property. Lastly, 3-D executed a renewal of the loan after 3-D no longer owned the subdivision property and after numerous requests to transfer the loan to Lamar Davis, Inc. had supposedly gone unheeded.

An order consistent with this memorandum of decision will enter separately.

Done this 14th day of December, 2004.

/s/ Dwight H. Williams, Jr.
United States Bankruptcy Judge

c: Charles M. Ingrum, Sr., Attorney for Debtor
Greg L. Davis, Attorney for Lamar Davis, Inc.
Edward J. Peterson, III, Attorney for SouthTrust Bank
Jesse S. Vogtle, Jr., Attorney for Bank of Wedowee
Dan W. Taliaferro, Esq.